UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARCUS BUB,                          )
                                     )
            Plaintiff,               )
                                     )
        v.                           )        No. 4:05CV2223 CDP
                                     )
LINDA S. MCMAHON,[1]                 )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) for judicial review of the

Commissioner's final decision denying plaintiff Marcus Bub's application for

disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq.

and supplemental security income benefits under Title XVI of the Act, 42 U.S.C.

§§ 1381 et seq.  Bub claims that he is disabled because of head and neck injuries.

The Administrative Law Judge, however, found that Bub was not disabled.

Because I find that the ALJ did not fully and fairly develop the record and

properly evaluate the evidence presented, I will reverse and remand the decision.

## Procedural History

_____

[1]  Linda S. McMahon became the Acting Commissioner of Social Security on January 20,
2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Linda S. McMahon
should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as Defendant in this suit.
No further action need be taken to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g).

On January 6, 2003, Bub filed applications for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income pursuant to Titles II and XVI of the Social Security Act. Bub alleged disability since January 21, 2002, due to a head and neck injury resulting in limited mobility of his neck, dizziness, headaches, loss of grip and balance, and an inability to lift over 20 pounds. The application was denied initially[2] on March 12, 2003. Bub requested a hearing which was held on April 19, 2004. The ALJ determined that Bub was not disabled. On September 26, 2005, the Appeals Council denied Bub's request for review. Thus, the decision of the ALJ stands as the final determination of the Commissioner.

Bub filed previous applications for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income pursuant to Titles II and XVI of the Social Security Act on May 29, 2002. Those applications were denied on August 1, 2002.

## Evidence Before the Administrative Law Judge

Bub was 38 years old at the time of the hearing. He completed schooling through eighth grade and later received his GED and finished one year of college-

---

[2] Missouri is one of several test states participating in modifications of the disability determination procedures applicable to this case. See 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466 (2001). These modifications include the elimination of the reconsideration step and, in some cases, the Appeals Council review step in the administrative appeals process. See id. Therefore, plaintiff's appeal in this case proceeded directly from her initial denial to the ALJ level.

level classes. Bub has work experience as an auto mechanic, over-the-road truck driver, construction carpenter, laborer, and equipment operator. He was participating in a vocational rehabilitation program but could not continue because of lack of transportation. He lives with his wife and two children, aged 12 and 8, at the time of the hearing. Bub has received workers' compensation benefits in the past.

Bub testified that he has been unable to work since January 21, 2002, because of dizzy spells and neck pain. He claims to suffer from continuing problems as a result of an accident on October 8, 2001, in which he was knocked off the back of a truck. His complaints include short-term memory problems, constant headaches, limited neck mobility, neck pain, tingling in his hands, back pain, numbness in his legs and feet, and depressive symptoms. He said he has trouble remembering phone numbers and recalling what he read right after reading it. He testified that he has had constant headaches for the last two years that are on a pain scale of 5 out of 10. Bub estimated his neck mobility at 30 degrees total and his neck pain at a 6 out of 10. He takes over-the-counter medication for his headaches and pain. He has refused prescription medication for his back pain because it makes him feel "like a zombie." He testified to problems standing up straight and problems with numbness in his legs and feet which he estimated occurs 50% of the time. Bub acknowledges having some depressive symptoms such as getting easily aggravated and crying a lot. Bub recently visited a

physician who wanted to start treating him for depression.  The physician gave him a two week trial pack of medication.

Bub also described problems lifting things that weigh more than 20 or 30 pounds and occasional problems walking, standing, sitting, and sleeping.  He has lower back pain from bending over to pick things up.  Approximately 20% of the time Bub has problems walking because his knees or back gives out.  In addition, about 30% of the time Bub has sharp pains in his lower back when standing.  When he sits, his legs often fall asleep.  Bub often loses sleep as a result of the neck and back pain.

Bub testified that he has difficulty completing some tasks in the home.  Washing his hair is sometimes difficult because it hurts when he raises his arms up that high.  Because of pain associated with bending over, tying his shoes and some tasks involved with the laundry are painful.  Cooking often leads to burnt food because of his forgetfulness.  However, Bub does help with chores such as washing dishes, laundry, mowing the lawn, vacuuming, and grocery shopping.  He also helps with his two children by making sure they have done their homework, that they have bathed, and that they get to the bus stop on time.

Bub has a commercial driver's license.  He testified that he drives only when necessary or every once in awhile for errands.  He goes out to eat and talks

on the phone every once in awhile. His typical day includes laundry, washing dishes, and other work around the house or visiting a friend. Bub has tried jobs at gas stations, in maintenance, and in telemarketing. None of these worked out because of the requirements of heavy lifting and sitting for long periods of time. His wife provides the only income for the household. Bub testified that he has a felony conviction for sale of a controlled substance.

There was no other testimony at the hearing, but the ALJ held the record open so Bub could submit an affidavit from his wife, Elizabeth Ann Bub. Since her husband's October 2001 accident, Elizabeth states that he has changed so significantly that it is like living with another person. Besides the great pain, Bub often complains about severe headaches, limited neck mobility, shooting pain in his neck and arms, and numbness in his hands and legs. She has personally observed her husband's limited range of motion in his neck, constant confusion and inability to remember things that have happened since the accident, the bump on the back of his head, permanent bruise on his right hip, increasing problems hearing, and attention loss in the middle of a conversation. Elizabeth states that her husband has become cold towards her. He exhibits signs of depression such as angry outbursts, sleeping a lot, sullen and low behavior, and inability to cope with life.

Elizabeth must shave her husband's face because he is in too much pain to do it himself. She has noticed that Bub must keep his shoes loosely tied so that he can put them on without bending over. She said he has problems dressing himself because it requires putting his arms over his head. His help with laundry, sweeping and vacuuming are all limited by his inability to bend over without being in pain. Elizabeth says that Bub can only wash a few dishes and that he cannot lift heavy items. A couple times each month Bub's back pain gets so severe that he spends the day in bed. On one occasion he was bedridden for 3 days. When he does get out of bed it takes him half an hour.

Records from the Missouri Division of Vocational Rehabilitation indicate that Bub applied for services in June of 2002. According to the case notes from an August 2002 appointment with his counselor, Bub stated that he had recently been denied social security. He went on to say that he was still interested in working, he just wanted to get some income from social security in the meantime. After a vocational evaluation, Bub chose benchworker as his vocational goal. But in February of 2003 he interrupted, and eventually terminated, his services because of lack of transportation.

### Medical Records

On October 8, 2001, Bub fell off the back of a truck at work and suffered

multiple injuries, including a head injury and an ankle sprain. He was cleared to return to work on October 29, 2001, but he received some follow-up care for his injuries.

Dr. Gary Schmidt found Bub's ankle to have reached maximum medical improvement on November 6, 2001, and noted that Bub had minimal pain and full range of motion. On September 27, 2002, Dr. Schmidt estimated Bub's disability at 2%.

Bub was seen in the emergency room of the Missouri Baptist Medical Center on February 1, 2002, for severe head and neck pain. He had X-rays of his cervical spine, which showed mild degenerative changes at C5-6. A CT scan of his head was negative. He was diagnosed with neck sprain and given pain medication.

Bub was referred by worker's compensation to Dr. Michael Polinsky, a neurosurgeon, for treatment for his neck pain after the October 2001 accident. Dr. Polinsky reviewed the test results from Bub's February 1, 2002, visit to the emergency room. Dr. Polinsky opined that the CT scan of Bub's head and the cervical spine plain films with flexion/extension views were all within normal limits. Bub was referred to a few weeks of physical therapy. Bub had an MRI scan of his cervical spine on April 16, 2002. Dr. Polinsky noted that the MRI

revealed a bulging disc at the C5-C6 level with some evidence suggesting lateralization to the right, and mild degenerative disc disease at the C7-T1 level. However, no disc herniation, spinal canal stenosis, or nerve root impingement was detected. On April 19, 2002, Dr. Polinsky opined that Bub had reached maximum medical improvement but gave him permanent restrictions of not lifting more than 20 pounds and not lifting overhead. In a follow-up visit on September 13, 2002, Dr. Polinsky found that Bub had a mild decrease in his cervical range of motion, but that he had otherwise fully recovered from the fall. Dr. Polinsky estimated Bub's permanent partial disability rating at 5%.

As part of his evaluation by vocational rehabilitation services, Bub had a neuropsychological exam by Herbert Goldman, Ph.D., on June 25, 2002. After performing a series of tests, Dr. Goldman opined that Bub's scores were average or normal in intellectual functioning, reading and mathematics, attention and concentration, memory indices, grip strength, speech, and executive functioning. His written language score indicated a disorder of written expression exhibited by problems with spelling, punctuation and sentence structure. The speed at which Bub processes simple or routine visual information and performs tasks based on that information was slower than expected compared to his IQ and memory. Dr. Goldman accessed Bub's score on the Beck Depression Inventory to be within

normal limits, indicating no significant level of depressive symptomatology. Dr.

Goldman did indicate that Bub's slowed psychomotor speed and somewhat less

efficient right-dominant hand performance could be subtle indicators of a very

mild residual brain dysfunction. Dr. Goldman diagnosed Bub with a mild, not

otherwise specified, cognitive disorder and a disorder of written expression.

Upon request of the social security office, Michael O'Day, D.O. completed

a physical exam of Bub on February 11, 2003. Dr. O'Day opined that Bub could

stand and walk a combined total of 6 to 8 hours daily or sit for at least eight hours

daily with appropriate rest periods. He also concluded that Bub could bend, stoop,

crouch, squat, and kneel without restriction. According to Dr. O'Day, Bub could

lift and transport 35 pounds occasionally. He found no impairments in Bub's

traveling capabilities, communication skills, bilateral foot control, or his fingering,

handling, and grasping with his upper extremities. The only limitation Dr. O'Day

advised for Bub was staying away from unprotected heights.

Also in February of 2003, Raymond Cohen, D.O., provided a neurological

consult on Bub. After reviewing Bub's medical records and conducting a general

physical and neurological exam, Dr. Cohen diagnosed Bub with the following

trauma resulting from the fall off of the truck in 2001: (1) post-traumatic vascular

headaches; (2) moderately severe cervical myofascial pain disorder; (3) bilateral,

right greater than left, carpal tunnel syndrome; and (4) depression. Dr. Cohen opined that Bub needed additional treatment for his headaches and for depression, cervical trigger point injections followed by physical therapy, and an upper extremity NCV and referral to a hand surgeon. Without any additional treatment, Dr. Cohen estimated that Bub had a 30% whole person disability due to the head injury, a 20% whole person disability at the level of the cervical spine, a 15% permanent partial disability at the left wrist, and a 15% permanent partial disability at the right wrist. Dr. Cohen also recommended vocational rehabilitation for job re-training.

Based on Dr. Cohen's finding, Bub was referred to Dr. Coleman for pain management services relating to the neck and head pain. On May 12, 2003, Dr. Coleman recommended trigger point injections in three or more muscle groups. It is unclear from the records whether Bub ever received these injections.

Bub had another MRI of his lumbar spine on November 5, 2003, after complaining of back pain. Nothing definitive was determined but the radiologist did question whether Bub had a bilateral pars defect at L5.

Most recently Bub had an outpatient visit with Dr. John Emmons, D.O. Bub reported similar complaints as those described in his testimony before the ALJ. Dr. Emmons noted that Bub seemed anxious and mildly depressed. Overall Dr.

Emmons assessed Bub as having: (1) degenerative disc disease by history, (2) bulging disk, C6-7, by history, (3) bilateral carpal tunnel syndrome by history, (4) frequent dizziness by history, (5) minor depressive disorder, (6) generalized anxiety disorder, (7) insomnia, and (8) rule out hypothyroidism. Dr. Emmons gave him a sample pack of antidepressants.

Among the exhibits in this case are many records for medical treatment received prior to Bub's October 2001 accident. In March of 1985, Bub was examined in the emergency room for injuries to his leg and knee after being struck by a car. In May of 1988, Bub was hospitalized after overdosing on Tylenol in an attempt to commit suicide. He was diagnosed with 'Adjustment disorder with depression,' and spent over a week in the Psychiatry Center.

While Bub was in the custody of the Missouri Department of Corrections, he requested medical services many times. He was admitted to the hospital for suicidal ideation on October 18, 1988, where he was diagnosed with polysubstance abuse and antisocial personality. Bub complained of headaches and sinus congestion multiple times in 1989. On February 18th and 21st of 1989, Bub went to the emergency room for severe headaches. An X-ray of his paranasal sinuses indicated sinusitis of both maxillary antrums. He requested to see a psychologist and stated that he thought he was having an emotional break down in

June of 1989. In the following month, Bub said he thought he was losing his mind and the Department of Corrections psychologist diagnosed him with borderline personality. Bub complained of lower back pain in August of 1989. For many months in 1990, Bub was on Prozac for his depression.

After a work related injury in July of 2000, Bub received treatment for his right fifth finger and a contusion on his right leg. Bub was restricted to light work duties and referred to physical therapy. He was released back to full work duty in September of 2000.

In August of 2001, he sought medical treatment for "back injury - work related." An MRI of his lumbar spine revealed: (1) no evidence of acute lumbar spine fracture or malalignment; (2) a suggestions of a pars defect at L5 without evidence of spondylolisthesis; and (3) mild lumbar scoliosis.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or because the court would have decided the case differently. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current

work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

Id. at 1322.

## The ALJ's Findings

Based on the entire record, the ALJ found that Bub was not disabled. He

issued the following findings:

1. The claimant met the disability insured status requirements of the Act on January 21, 2002, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since January 21, 2002.

3. The medical evidence establishes that the claimant has degenerative disc disease and residuals from injuries in a fall from a truck, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's allegations of symptoms precluding any work are not credible as they are not consistent with the credible evidence for the reasons specified in the body of this decision.

5. The claimant has the residual functional capacity to perform the physical exertion requirements of work involving occasional lifting of up to twenty pounds, with no frequent lifting or carrying in excess of ten pounds. He can do work requiring a good deal of walking or standing, approximately six hours off and on during an eight hour work day, with the remaining time involving intermittent sitting. (20 CFR 404.1545 and 416.945).

6. The claimant is unable to perform any of his past relevant [work].

7.    The claimant has the residual functional capacity to perform the full range of light work (20 CFR 404.1567 and 416.967).

8.    The claimant is 38 years old, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

9.    The claimant has the equivalent of a high school education (20 CFR 404.1564 and 416.964).

10.   In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

11.   Section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rules, Table No. 202.21 of Appendix 2, Subpart P, Regulation No. 4, direct a conclusion that, considering the claimant's residual functioning capacity, age, education, and work experience, he is not disabled.

12.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The ALJ found that Bub has the severe impairments of degenerative disc disease and residuals from injuries in the fall, but that the medical findings do not meet or medically equal in severity or duration the requirements of any impairment contained in the Appendix 1 Listing of Impairments.

The ALJ concluded that Bub's testimony was not fully credible to the extent he alleged an inability to perform any substantial gainful activity. He felt that Bub's testimony portrayed a person somewhat limited by his impairments but that the allegations of symptoms precluding all work were not persuasive. The ALJ

17

reached this conclusion based on inconsistencies in the record, including the lack of objective medical evidence identifying any underlying basis for pain at the level of severity alleged by Bub.

## Discussion

Over 600 pages of medical records are contained within the exhibits filed in this case. The ALJ's decision discusses the records from Drs. Schmidt, Polinsky, Goldman, O'Day, and Emmons. Additional hospital records for emergency room visits, X-rays, MRI scans, and vocational rehabilitation are also mentioned in his decision. However, the record contains many medical reports not discussed by the ALJ. The Court is aware that the ALJ does not have to discuss every piece of evidence presented in his decision. Miller v. Shalala, 8 F.3d 611, 613 (8th Cir. 1993). However, the ALJ does have a duty to develop the record fully and fairly. Id. In this case, I would not be troubled by the ALJ's lack of reference to all of the medical records, except that statements made by the ALJ in his decision directly contradict records in the file.

For example, in considering Bub's testimony on his problems with his hands and arms, the ALJ stated that Bub "told Dr. Emmons that he had previously been diagnosed with carpal tunnel, but no evidence of this diagnosis has been presented." Contrary to this statement, on February 26, 2003, Dr. Cohen

diagnosed Bub with "bilateral, right greater than left, carpal tunnel syndrome" after a general physical and neurological exam. Dr. Cohen recommended that Bub be referred to a hand surgeon for evaluation of his carpal tunnel.

Bub also testified to constant headaches over the two years before the ALJ hearing. In evaluating the credibility of this testimony, the ALJ stated: "There is no evidence that [Bub] has ever been treated for chronic headaches or been diagnosed with any headache-related impairment." However, Dr. Cohen diagnosed him with post-traumatic vascular headaches and opined that needed additional treatment for the headaches. Additionally, the records from the Missouri Department of Corrections contain many complaints by Bub for headaches which resulted in medical treatment and testing. Medical records dated May 17, June 29, September 24, November 3, and November 20 of 1989, all refer to headache complaints from Bub. The state's treating physician diagnosed the cause of Bub's headaches as chronic sinus disorder on May 17, 1989. It appears from the records that Bub received a sinus X-ray on December 1, 1989, which revealed a septal deviation to the left and ethmoid sinuses. In addition, there are medical records from St. Anthony's Medica Center for treatment of headaches and sinusitis in February 1989, including an X-ray of his paranasal sinuses which indicated sinusitis of both maxillary antrums.

In reference to severe mental health problems, the ALJ discounted Dr.

Emmons' finding that Bub has minor depressive disorder and generalized anxiety

disorder because Dr. Emmons is not a mental health specialist and because

Emmons made these diagnoses at his first visit with Bub. The ALJ stated that Bub

"has never had any psychiatric treatment or psychological therapy" and that Bub

had "not been given any psychotropic medication until his visit with Dr.

Emmons." The medical records reveal otherwise. On May 3, 1988, Bub was

admitted to St. Anthony's Medical Center after overdosing on Tylenol in an

attempt to commit suicide. He was transferred to the Psychiatry Center where he

was treated for over a week for adjustment disorder with depression. The

Missouri Department of Corrections records also indicate that Bub has mental

health problems. He was admitted to the hospital in October of 1988 for suicidal

ideation. On June 20, 1989, he requested to see a psychologist and on June 28,

1989, he stated that he thought he was having an emotional break down. In the

following month, Bub stated that he thought he was losing his mind and was

diagnosed with borderline personality. He requested counseling again in March

and April of 1990 and sometime in 1990 he started taking Prozac daily for his

depression. Bub was treated by a licensed psychologist through the Department of

Corrections. In 2003 Dr. Cohen also concluded that Bub suffered from depression

that required treatment.

If the ALJ had simply not mentioned the report of Dr. Cohen and Bub's other medical records revealing chronic headaches and mental health treatment, the Court might conclude that the ALJ's finding of no disability implicitly rejected these medical records. However, this is not a case of the ALJ simply not mentioning some of the medical reports. Multiple statements in the ALJ's decision directly contradict numerous pages of medical records.

The ALJ has a duty of fully and fairly developing the facts of the case, even when the claimant is represented by counsel. Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)). Where an ALJ fails to fully develop the record, it is proper to remand for the taking of additional evidence. Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002) (citing Payton v. Shalala, 25 F.3d 684, 686 (8th Cir. 1994)).

Based on the inconsistencies between the medical records on file and statements by the ALJ in his decision, the Court can only conclude that the ALJ's decision did not consider all of the evidence in the record. The ALJ found Bub's allegations of symptoms precluding all substantial gainful activity not credible. I cannot speculate as to whether that finding would be different if the ALJ had taken into account all of the medical records. Credibility determinations are for the ALJ

to make.  <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000).

When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination using the factors set forth in <u>Polaski</u>.  <u>Baker v. Apfel</u>, 159 F.3d 1140, 1144 (8th Cir. 1998); <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered the relevant evidence.  <u>Jeffrey</u>, 849 F.2d at 1132; <u>Butler v. Secretary of Health & Human Servs.</u>, 850 F.2d 425, 429 (8th Cir. 1988).  The ALJ evaluated Bub's testimony under the standards set forth in <u>Polaski</u>, 739 F.2d 1320.  But I do not feel that he sufficiently demonstrated that he considered all of the relevant evidence because statements made in his decision fail to take into account medical records in the file.

The ALJ found Bub's degenerative disc disease and residuals from injuries in the fall from the truck to be severe impairments under the Social Security Act.  Yet, he said that Bub's medical findings did not meet or medically equal in severity or duration the requirements of any impairment contained within the Appendix 1 Listing of Impairments.  Again, it is possible that the ALJ's findings and ultimate decision would have been different if all of the medical records had been considered.  Conflicts in the evidence are to be resolved by the Secretary, not the courts.  <u>Janka v. Secretary of Health, Ed. and Welfare</u>, 589 F.2d 365, 369 (8th

Cir. 1978).

Bub argues in his appeal to this Court that the ALJ committed error by failing to have a vocational expert testify at his hearing. Bub asserts that this testimony is required because of his non-exertional impairments of memory problems, pain, headaches, and depression. The Commissioner responds that the ALJ may rely on the Medical Vocational Guidelines instead of a vocational expert, even if there are nonexertional impairments, if the ALJ finds, and the record supports the finding, that the nonexertional impairments do not diminish claimant's residual functional capacity to perform a full range of activities listed in the Guidelines. Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997). Residual functional capacity is a measure of what an individual can do despite the limitations imposed by a physical or mental impairment. 20 C.F.R. § 404.1545. Given that there are medical records on the nonexertional impairments of depression and headaches that were not considered by the ALJ, I cannot say that the ALJ's residual functional capacity finding would not have been different. It is the ALJ's duty to consider all of the medical evidence and resolve conflicts.

I find that the ALJ did not fulfill his duty of fully and fairly developing the record and properly evaluating the evidence presented. As a result, I cannot conclude that there is substantial evidence on the record as a whole to support the

ALJ's decision. After review of all medical records on file and development of any additional facts as needed, the Commissioner should reevaluate Bub's physical and mental impairments and complaints in accordance with Polaski. Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of all of the medical records included in the claimant's file. See Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (finding that remand under sentence four of 42 U.S.C. section 405(g) is proper when the apparent purpose of the remand was to prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of all medical records included in the claimant's file.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 25th day of January, 2007.